**J. W. NEFF and Elizabeth A. Neff**
v.
**The UNITED STATES.**
**No. 419-59.**

United States Court of Claims.

July 18, 1962.

Rehearing Denied Oct. 3, 1962.

Norman A. Peil, Jr., Easton, Pa., for plaintiffs.

Earl L. Huntington, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S. Smith, Lyle M. Turner, James P. Garland and Philip R. Miller, Washington, D. C., on the brief.

DURFEE, Judge.

This case is now before the court on defendant's motion for reconsideration of our original decision, which was issued April 4, 1962. Plaintiff in this action sought refund of income taxes in the amount of $8,702, paid as a result of deficiencies assessed, and interest thereon.

The sole legal issue before us is whether a transaction effecting a redemption of stock by a closely held corporation, as set out below, constituted a distribution essentially equivalent to a dividend, and was thus taxable to plaintiffs as ordinary income within the purview of section 302 of the Internal Revenue Code of 1954, 26 U.S.C. (I.R.C.1954) § 302 (1958 ed.), or whether it was a distribution in full payment in exchange for the stock and not so taxable.

J. W. Neff Laboratories, Inc. (hereinafter referred to as the company) was .organized and incorporated in Delaware during May 1938. Under the charter 500 shares of $10 par value common stock were authorized, of which 100 shares were issued. Plaintiffs owned 48 of these shares (47 Mr. Neff; and 1 Mrs. Neff).[1] Thereafter during 1938 the company was incorporated in Pennsylvania, with authorized capital, stockholders, and distribution of shares remaining identical. The Delaware franchise was subsequently terminated.

1. Inasmuch as § 318 of the Code attributes these shares to Mr. Neff for all purposes relevant to this proceeding, and since all of the action taken with respect to shares for the purposes of this litigation was taken by Mr. Neff, we shall refer to Mr. Neff as holding all of the shares for the remainder of the opinion.

No further transactions occurred with respect to company stock until September 1949, when Mr. Neff purchased the 51 shares held by the other major original stockholder from his estate for $14,000. Mr. Neff paid $6,000 of the $14,000 purchase price from his personal funds, and the remaining $8,000 from funds which he borrowed from the company in return for his personal note. After this purchase Mr. Neff owned 99 of the company's 100 outstanding shares.

During September 1950 Mr. Neff borrowed an additional $5,000 from the company for which he again gave his personal note. This brought his total indebtedness on notes payable to the company to $13,000.

Between 1946 and 1954 the company produced material from which phonograph records were fabricated. During these years the company operated under an arrangement with the Binney & Smith Company whereby Binney & Smith financed certain of the company's operations. By 1954 competition in the phonograph record business had become acute, and profits had diminished. Additional capital was required by the company to embark on a different manufacturing operation.

The testimony indicates that it was ultimately concluded that the most feasible method for raising needed capital was through the local sale of company stock. It was decided that Mr. Neff would sell 47 of his shares to the company, which in turn would sell them for its own account and thus acquire additional capital. The presence of the 400 authorized but unissued corporate shares was apparent from the readily available basic corporate documents as well as through a simple computation apparent on the face of each stock certificate. Had the company issued new shares to meet its need for additional capital, the result would have been substantially similar. Despite the apparent availability of this alternative course, on September 30, 1954, Mr. Neff transferred 47 shares to the company for $405 per share, or a total of $19,035. At this time book value of the shares was $852.47 per share. The total price of $19,035 was paid by the company by: (a) cancellation of the $13,000 in notes payable from Neff to the company; (b) cancellation of a loan receivable representing cash advances to Mr. Neff from the company amounting to $776.55; (c) transfer to Mr. Neff of an automobile owned by the company and valued at $2,434.11; and (d) creation of an open account in Mr. Neff's favor on the company books of $2,824.34. Thirty-eight of the 47 shares thus redeemed from Mr. Neff were subsequently sold by the company over a period from February 24, 1955 through January 11, 1956 at prices ranging from $2,874 to $4,250 per share.

The Government, viewing the redemption transaction as a distribution essentially equivalent to a dividend, and thus subject to tax as ordinary income, assessed a deficiency which plaintiffs have paid. Plaintiffs, in their suit for refund, contend the deficiency assessment was erroneous because the redemption resulted in a corporate distribution which was payment in exchange for stock held more than six months and thus taxable only under the provisions of the code relating to long-term capital gains.

Plaintiffs' position that the assessment was erroneous is bottomed on two contentions; that the redemption was undertaken exclusively for a valid corporate purpose, to raise corporate capital, and that after the redemption and subsequent to the sale of 38 of the 47 redeemed shares taxpayers' proportionate holding of outstanding company shares had changed radically.

The Government, in countering plaintiffs' contention that the redemption was not essentially equivalent to a dividend, relies on the structure and history of section 302, 26 U.S.C. (I.R.C.1954) § 302 (1958 ed.). Section 302(a) provides that if a corporation redeems its stock within the meaning of section 317(b), to which the present redemption conforms, and if any one of subparagraphs (1), (2), (3), or (4) of subsection 302(b) applies to the transaction, the redemp-

tion will be treated as a distribution in part or full payment in exchange for stock. Subparagraph 302(b)(1) requires that the redemption be treated as a distribution in payment in exchange for stock if it is "not essentially equivalent to a dividend."

Inasmuch as it seems obvious that the present distribution cannot escape taxation as ordinary income by virtue of any of the specific exculpatory provisions enumerated in subparagraphs (2), (3), and (4) of section 302(b), we shall devote our attention exclusively to the general provision embodied in section 302(b)(1) on which plaintiffs rely.

Section 302(b)(1) of the 1954 Code was essentially a reenactment of section 115(g) of the 1939 Code insofar as it reiterated the broad "essentially equivalent to a dividend" test, and, under § 302(b)(5), was intended to apply regardless of the transaction's failure to qualify under any of the specific provisions enumerated in subparagraphs (2), (3), and (4) of § 302(b).[2]

Our task then is to determine whether, on the basis of the facts before us, the transaction by its nature resulted in a distribution essentially equivalent to a dividend.

Even assuming that the sole force motivating the redemption was, as plaintiffs contend, the desire to raise additional capital to support corporate operations, we would view the distribution as one by its nature essentially equivalent to a dividend. Although such motivation would undoubtedly constitute a valid corporate purpose, we do not find the presence of valid corporate purpose dispositive. Holsey et al. v. Commissioner of Internal Revenue, 3 Cir., 258 F.2d 865, 869 (1958); Northup v. United States, 2 Cir., 240 F.2d 304, 307 (1957). While the absence of any valid corporate purpose as motivating the redemption might constitute substantial evidence indicating that the redemption distribution was essentially equivalent to a dividend, we do not believe that the presence of such corporate purpose establishes, *per se,* non-equivalence.

Moreover, while the ultimate sale of the redeemed shares might be deemed related to the corporate purpose of raising additional capital, we find the present redemption itself devoid of any such real relation. Once it had been decided that the corporation required new capital, the most obvious course would have been for the company to issue additional shares and then market the newly-issued shares. Of the 500 shares authorized, only 100 shares had been issued. Had 38 more of the authorized shares been issued and sold in precisely the manner undertaken here, the assets of the company would have remained intact prior to the sale, the total corporate assets would have been incremented by an identical amount of new capital from the

---

2. Senate Report No. 1622, 83rd Congress, 2nd session, in discussing subsection (b) of section 302 states:

"* * * In lieu of the approach in the House bill, your committee intends to revert in part to existing law by making the determination of whether a redemption is taxable as a sale at capital gains rates or as a dividend at ordinary income rates dependent, except where it is specifically provided otherwise, upon *a factual inquiry.*

* * * * *

"Subsection (b) of section 302 states three conditions in paragraphs (1), (2), (3), and (4), the satisfaction of any one of which will result in the treatment of the redemption as a distribution in full or part payment in exchange for the stock.

* * * * *

"Paragraph (1) of subsection (b) provides that subsection (a) will apply if the redemption is not essentially equivalent to a dividend.

"The test intended to be incorporated in the interpretation of paragraph (1) is in general that currently employed under section 115(g)(1) of the 1939 Code. Your committee further intends that in applying this test for the future that the *inquiry will be devoted solely to the question of whether or not the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation.* * * *." U.S.Code Cong. and Adm.News 1954, p. 4870 (Italics added.)

sale, and Mr. Neff's proportionate ownership in the corporation would have been altered to a degree substantially similar to the change that resulted from the transaction as it actually transpired. Instead the more complex and circuitous redemption procedure was chosen which brought an identical amount of new capital to the company coffers and changed Mr. Neff's proportionate interest in the company to essentially the same degree. The only difference between the newly-issued-stock procedure and the redemption method selected was that the latter resulted in a $19,035 distribution from the company's accumulated earnings and profits to Mr. Neff, who at that time owned 52 of the 53 outstanding corporate shares. In this context the distribution of $19,035 is entirely divested of any real relation to the ultimate change in proportionate ownership upon sale of the redeemed shares, and bears every attribute of a pro rata corporate distribution constituting a dividend.

In pursuing our factual inquiry into the nature of the present transaction, we deem it both relevant and enlightening to consider Mr. Neff's essential relation to the corporation. Commissioner of Internal Revenue v. Roberts, 203 F.2d 304 (CA4th, 1953). Prior to the redemption Mr. Neff owned 99 percent of the corporate shares and assets, and was in effect *the* owner of the corporation and *the* director of its affairs. After the redemption, in addition to the $19,035 distribution he received out of corporate earnings and profits, Mr. Neff owned approximately 98 percent of the outstanding corporate shares and assets (52 of the 53 outstanding shares), virtually the same proportion that he owned before the redemption. No change whatever occurred in Mr. Neff's relation to the corporation until after the corporation began to dispose of the shares it had redeemed, which disposition, as we have indicated earlier, bore no essential relation to the redemption. It is worthy of note that there had been no prior commitment requiring sale of the redeemed shares immediately after the redemption.

Had the shares been retired rather than redeemed and had the corporation then issued and sold an equal number of shares, there could be no question that the distribution in payment for the shares would be deemed essentially equivalent to a dividend, inasmuch as there could have been no connection, real or imagined, between redemption and ultimate change in proportionate ownership. We find in the facts as they actually transpired no greater connection between the redemption and ultimate change in proportionate ownership. In the context of a company in effect owned, controlled, and directed by one individual, the mere change in wording of the fiat decreed by that single owner cannot alter the tax consequences of the transaction. The realities of the situation must prevail.

On a more pragmatic level we find it interesting to view the monetary aspects of the present transaction. The book value of the shares at the time of redemption was $852.47 per share. After reduction of the corporate assets by removal of the $19,035 distributed to Mr. Neff, each corporate share was worth $662.12. The subsequent sale of 38 of the 47 redeemed shares brought a total of $125,876 in new capital to the company treasury. Thus, at the time redeemed, the outstanding shares had a real total value of $66,212, based on a book value of $662.12. After sale of the 38 shares the total assets of the corporation were $192,088, and the book value of each of the 91 outstanding shares was $2,103.58. Thus before the redemption, excluding the $19,035 he withdrew, Mr. Neff's 99 shares had a book value of $65,549.88, while after the redemption and sale his 52 shares at book value were presumably worth $109,386.16, or $43,836.28 more than his 99 shares were worth prior to the occurrence of the transactions with which we are concerned. In addition to this monetary accretion in the value of his holding after these events had transpired, Mr. Neff retained control of the corporation as well as the $19,035 distribution.

For the reasons stated we conclude that the distribution of $19,035 to Mr. Neff was one essentially equivalent to a dividend. Consequently we find that it was properly taxed as ordinary income, and that the deficiencies were properly assessed and collected. Our previous opinion, findings of fact and conclusion of law, entered April 4, 1962, will therefore be vacated and withdrawn. This opinion and the findings and conclusion of law which follow will be substituted therefor. Plaintiff's petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and DARR, Senior District Judge, sitting by designation, concur.

DAVIS, Judge, took no part in the consideration and decision of this case.

WHITAKER, Judge (concurring).

I concurred with Judge LARAMORE and the CHIEF JUDGE in the decision rendered on April 4, 1962, but, on further reflection, I am convinced that decision was in error. I concurred in the former opinion because I thought we should compare Neff's relationship to the corporation before the redemption with his relationship after all sales of his stock had been made. I am afraid this ignores the provision of section 302, that the comparison must be made between the situation before and "immediately after the redemption."

Besides, it would seem the same result could have been achieved by the sale of the unissued stock of the corporation, as Judge Durfee's opinion states. Had this been done, Mr. Neff would not have benefited to the extent of $19,035, as he did under the plan adopted.

I now concur in Judge DURFEE's opinion.

LARAMORE, Judge (dissenting).

I am of the opinion that the transaction in this case was not equivalent to a dividend. The reason I think this is not equivalent to a dividend is based on the following: Plaintiff J. W. Neff was the sole stockholder of the J. W. Neff Laboratories, Inc. This corporation needed additional operating capital. It could not borrow money from the banks; no purchaser would buy stock directly from Mr. Neff since the proceeds of the sale would inure to Neff rather than to the corporation. Hence, Mr. Neff decided to sell to the company 47 of the 99 shares he owned at about half of the book value of the shares. This was for the purpose of permitting the corporation to resell these, which it thought it could do at a profit, and thereby secure the capital necessary to the continuation of the corporation. The corporation did resell 38 shares over a period of between 9 to 12 months, and realized a profit greatly in excess of what the corporation had paid Mr. Neff. The fact that the resale was accomplished over a period of some 9 to 12 months, in my opinion, would not change the complexion of the transaction. Obviously the stock could not be immediately sold at the profit eventually realized. The 9- to 12-month period necessary to complete the transaction should not, and could not, as later demonstrated, alter the situation to the extent of making the sale equivalent to a dividend.

Thus, when the transaction is viewed as a whole, the entire purpose had been accomplished; i. e., the gathering of additional money to sustain the future operations of the corporation. I realize that the presence of a valid business purpose alone is not controlling. Holsey v. Commissioner, 3 Cir., 258 F.2d 865, 869; Northup v. United States, 2 Cir., 240 F.2d 304, 307. However, in this situation, Mr. Neff, after the sale, had a quite different interest than before. This being true, the money and property given him by the corportion in exchange for his stock could not be considered the equivalent of a dividend. When a person receives a dividend, his interest in the company remains exactly the same. This is not the case here. After the entire transaction, Mr. Neff's interest in the company was 56 percent as opposed

to his 99 percent stock ownership before.

It is true that section 302(b) (2) (C) (i) contains the language "immediately after the redemption." However, the fact that the stock was sold by the corporation over a period of months would not, in my opinion, have the effect of bringing into play section 302(b) (2) of the 1954 Code. Section 302(b) (1) of the 1954 Code was a re-enactment of section 115(g) of the 1939 Code and reiterated the essential equivalent to a dividend test. The prior law on the subject was preserved, as is disclosed by the legislative history of section 301(b) (1).

Senate Report No. 1622, 83rd Congress, 2nd session, in discussing subsection (b) of section 302, states:

"* * * In lieu of the approach in the House bill, your committee intends to revert in part to existing law by making the determination of whether a redemption is taxable as a sale at capital gains rates or as a dividend at ordinary income rates dependent, except where it is specifically provided otherwise, upon a factual inquiry.

\* \* \* \* \* \*

"Subsection (b) of section 302 states three conditions in paragraphs (1), (2), (3) and (4), *the satisfaction of any one of which* will result in the treatment of the redemption as a distribution in full or part payment in exchange for the stock. [Italic supplied]

\* \* \* \* \* \*

"Paragraph (1) of subsection (b) provides that subsection (a) will apply if the redemption is not essentially equivalent to a dividend.

"The test intended to be incorporated in the interpretation of paragraph (1) is in general that currently employed under section 115(g) (1) of the 1939 Code. Your committee further intends that in applying this test for the future that the inquiry will be devoted solely to the question of whether or not the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation. * * *"

From the above language, it seems clear that the tests under the 1939 Code are still pertinent to cases arising under section 302(b) (1) of the 1954 Code and that the remaining subsections (2), (3), and (4) of said section serve not as restrictions on the scope of subsection (1), but as additional areas in which capital gains treatment will be permitted. This was likewise held in the case of Radnitz v. United States, D.C., 187 F.Supp. 952, 956.

Having met the test of section 302(b) (1), i. e., that the redemption was not equivalent to a dividend, the intent of Congress as shown by Senate Report No. 1622, supra, was that the amount realized on the stock redemption should receive capital gains treatment.

For the above reasons, I believe plaintiffs are entitled to recover in this action.